IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**FILED**

NOV 0 6 2009

U.S. DISTRICT COURT
CLARKSBURG, WV 26301

CASSIE M. WHEELER,

   Plaintiff,

v.

        Civil Action No. 5:08cv164
        (The Honorable Frederick P. Stamp, Jr.)

MICHAEL J. ASTRUE,
Commissioner of Social Security,

   Defendant.

## REPORT AND RECOMMENDATION/OPINION

   This is an action for judicial review of the final decision of the Commissioner of the Social Security Administration ("Defendant," and sometimes "the Commissioner") denying Plaintiff's claim for supplemental security income benefits ("SSI") under Title XVI of the Social Security Act. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Gen. P. 86.02.

## I. PROCEDURAL HISTORY

   Plaintiff protectively filed an application for SSI benefits on August 31, 2005 (R. 74-87). She filed an application for SSI benefits on November 4, 2005, alleging the onset of disability as January 1, 1988, due to "brittle bone condition," which caused her to "hurt[] all over" (R. 74, 80-81). Plaintiff's application was denied initially and upon reconsideration (R. 48, 49). On August 14, 2006, Plaintiff filed a request for a hearing (R. 50). On October 5, 2007, Administrative Law Judge ("ALJ") Donald McDougall conducted a hearing, at which Plaintiff, who was represented by David Furrer, and James Ganoe, a vocational expert ("VE") testified (R. 376-401). On December 14, 2007, the ALJ

issued a decision finding Plaintiff was not disabled and could perform a range of light work (R. 13-26). Plaintiff appealed the ALJ's decision to the Appeals Council on January 29, 2008 (R. 12). On September 19, 2008, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 4-7).

## II. FACTS

Plaintiff was born on March 7, 1985, was twenty-two years and seven months old at the time of the administrative hearing and would have been almost three years old on the onset of her disability (R. 24, 74). Plaintiff's past relevant work included that of CNA and cook/cleaner in 2003 (R. 81).

From October 2, 2003, to January 26, 2005, Dr. Sheap treated Plaintiff for fevers, coughs, congestion, rashes, and other common ailments (R. 195-98).

On February 25, 2004, x-rays of Plaintiff's low pelvis, lateral projection of the left hip, and distal left femur showed the "growing rod extending through the greater trochanter of the left femur into the distal diaphysis" (R. 176). The x-ray made of her lumbar spine showed a "subtle left lumbar curve" and L5-S1 spondylolisthesis (R. 177).

On February 25, 2004, Dr. Jones corresponded with Dr. Seegar about Plaintiff's "having multiple different orthopedic related problems." Dr. Jones wrote he had "seen" Plaintiff "over the past 18-19 years for problems relative to her osteogenesis imperfecta." Dr. Jones informed Dr. Seegar that Plaintiff had not had a "large number of fractures." He noted Plaintiff "still ha[d] a rod in her femur that was placed many years ago and [was] continuing to give her a little trouble up around her left trochanteric bursal area." Plaintiff complained of bilateral hip pain. Dr. Jones' examination of Plaintiff revealed "some trochanteric bursitis on each side" and "some" focal lumbar and low back pain. Dr. Jones noted Plaintiff's x-rays, taken that date, showed grade 1 spondylolisthesis and

2

spondylitic defect at L5-S1. Dr. Jones wrote he thought Plaintiff could "be made better with the trochanteric bursitis with some physical therapy," but he "still [found] it difficult to believe she [was] going to be able to hold down any kind of active job." Dr. Jones opined that Plaintiff's "problems relative to her osteogenesis imperfecta, her trochanteric bursitis and her spondylolisthesis and back pain [would] . . . keep her from doing any kind of meaningful work." He wrote that Plaintiff "would have to do something that is fairly sedentary with her orthopaedic problems" (R. 174).

On April 12, 2004, Dr. Jones corresponded with Dr. Seegar relative to Plaintiff's "follow-up for her trochanteric bursitis and her back pain." Dr. Jones wrote that Plaintiff had gone to physical therapy one time, but she did not do the prescribed exercises and she did not return to physical therapy. He "[thought] [Plaintiff] ha[d] a type of a back pain problem that probably [was] never going to get better, but [he thought] that [he] [could] maybe make it improved to some extent" (R. 173).

On April 15, 2004, Plaintiff was examined by Dr. Esmer. He noted Plaintiff had a " undergone two sets of ventilation tubes in the past." Plaintiff reported she was "doing well." Plaintiff stated her "hearing loss [had] been progressive, worsening during the last several years" (R. 269). Dr. Esmer noted Plaintiff's "audiometric evaluation . . . reveal[ed] moderate hearing loss on the left side" and "severe to profound mixed hearing loss on the right" (R. 270). On April 16, 2004, Plaintiff underwent a tympanoplasty with ossiculoplasty of the right ear (R. 243-44).

On May 16, 2005, Plaintiff had an x-ray made of her lumbar spine. It showed "depression of superior endplate due to compression fracture of L1, and the focal kyphosis of T12-L1 [was] 11 degrees and has increased compared to February 25, 2004. There is spondylolysis of L5 with grade 1 spondylolisthesis at L5-S1" (R 172).

On May 16, 2005, Dr. Jones wrote to Dr. Kim relative to his examination of Plaintiff for a "follow-up for the orthopedic aspects of her osteogenesis imperfecta problems." Plaintiff informed Dr. Jones she had hearing loss, but he observed she was not wearing her hearing aides. Dr. Jones noted Plaintiff "had chronic problem with low back pain and she [did] have a [mild] spondylolisthesis [of grade I] and a spondylitic defect in her back." Dr. Jones noted Plaintiff's x-rays, taken that date, had not "changed any" (R. 170).

Plaintiff reported to Dr. Jones that, in addition to her low back pain, she had experienced "several different episodes where her legs got numb and buckled from underneath her." Plaintiff reported she had recently fallen and injured her right knee. Plaintiff complained of bilateral trochanteric bursitis on both right and left. Dr. Jones opined that the "rod in that left side" could not be "blame[d] . . . for her problem" because of the right sided pain. Plaintiff reported to Dr. Jones that her recent MRI was normal (R. 170).

Dr. Jones opined that he was "not sure with her complaints that with a normal MRI and normal x-rays that we can identify exactly what her problem is. She is currently, I think, . . . disabled and unable to work mostly due to the problems relative to back pain. . . . From my standpoint I do not see anything I can do for her surgically or anything that is going to do her any good. Otherwise, I am not sure that physical therapy would make any difference. We have tried that several times in the past and it has not seemingly made any difference. . . ." Dr. Jones opined Plaintiff could "do activities that she [was] comfortable doing" (R. 170).

On December 12, 2005, a physician form North Fork Primary Care Clinic, the facility at which Plaintiff had been treated form November 18, 2004, to December 12, 2005, completed a Routine Abstract Form – Physical, for the Social Security Administration (R. 178-89). Plaintiff was evaluated

for "brittle bone condition." The evaluating physician noted the physical findings were "as of" October 28, 2003 (R. 185). The North Fork Primary Care physician opined that the examination of Plaintiff's vision, hearing, speech, gait, station, fine motor ability, gross motor ability, joints, muscle bulk, reflexes, sensory deficits, motor strength, coordination, mental status, respiratory systems, cardiovascular system, and digestive system were normal (R. 186-88). The North Fork Primary Care physician opined Plaintiff was not "disabled from all occupations" and that Plaintiff "should be able to do any job that does not require physical labor" (R. 189).

On December 26, 2005, Gary Vandevander, an audiologist, informed Plaintiff that the audiological study revealed Plaintiff had moderate hearing loss in her left ear and severe hearing loss in the right ear. Mr. Vandevander wrote that the digital hearing aid with which Plaintiff had been fitted in her right ear "provide[d] [her] with improved hearing sensitivity on that side to within the mild loss of hearing range" (R. 190). When Plaintiff was fitted for her hearing aide, on July 15, 2005, she reported to Mr. Vandevander that she was "pleased" with it and that she was "receiving benefit" from the "device" (R.191). Mr. Vandevander noted, however, that, "even with the amplification unit," Plaintiff's "ability to hear and understand running conversational speech in most real world listening situations was rather reduced." Mr. Vandevander recommended Plaintiff not "place [herself] in a work situation that require[d] [her] to interact with the general public, unless that listening situation has extremely limited background noise" (R. 190).

On February 15, 2006, Dr. Garner completed an Internal Medicine Examination of Plaintiff. Plaintiff reported she had been diagnosed with osteogenesis imperfecta at birth. Plaintiff reported she had had "many broken bones and sprains of various joints throughout her life." Plaintiff stated she had broken her femur when she was two years old and a rod had been inserted to repair it. She had

5

fractured both wrists, elbows and arms. Plaintiff informed Dr. Garner that she was "currently experiencing back pain . . . ." Plaintiff reported her 2004 x-ray was unremarkable. She stated her legs were "becoming numb and weak" and "g[a]ve out from under her on occasion." Plaintiff stated she was "cognizant to avoid activities that may increase her risk of fracture of any bone in her body." Plaintiff stated she had "moderate hearing loss in the left ear and severe hearing loss in the right ear" and that she had a "digital hearing aid, which improve[d] her sensitivity." Plaintiff reported her "conversational speech understanding ha[d] been reduced" (R. 199). Plaintiff was medicating with "Ortho-Cyclen, multivitamin, Hydroxyzine, benzoyl peroxide, Singulair, Clobetasol cream, cortisone cream, Clindamycin, and Nasonex" (R. 200).

Plaintiff reported to Dr. Garner that she had shortness of breath with exertion, wheezing from asthma, no cardiovascular gastrointestinal, genitourinary, or neurological symptoms (R. 200). Dr. Garner reviewed Dr. Jones' letter to Dr. Kim, wherein Plaintiff had reported back pain, leg numbness and buckling, falling that had been "resolved," and hearing loss (R. 201).

Dr. Garner's physical examination revealed the following: Plaintiff's gait was normal; she had no difficulty rising from a seated to a standing position; she had no difficulty climbing up and down from the examining table; she was comfortable when seated and supine; Plaintiff spoke understandably; and she could hear and follow instructions (she was wearing a hearing aid in her right ear). Dr. Garner noted her examinations of Plaintiff's head, neck, ears, nose and throat were normal, except Plaintiff was wearing a hearing aid in her right ear, which did not produce any "gross abnormalities." Dr. Garner's examination of Plaintiff's chest was normal (R. 201). Plaintiff's cardiovascular and abdominal examinations were normal. Dr. Garner found Plaintiff's extremities were normal (R. 202). Upon examination, Dr. Garner found Plaintiff's ranges of motions of her

shoulders, elbows, wrists, hips, and cervical spine were normal. Plaintiff's hand could be fully extended; she could make a fist, bilaterally; and her fingers could be opposed, bilaterally. Plaintiff's upper extremity strength was normal; her grip strength was normal; her fine manipulation was normal. Dr. Garner found Plaintiff's lumbar spine's flexion-extension was to sixty degrees; her lateral lumbar spine flexion was normal; and her straight leg raising test was to sixty degrees, bilaterally, due to tenderness over the lumbar spinous processes. Plaintiff had no paravertebral muscle spasm (R. 202, 204-05). Plaintiff could stand on one leg at a time; she had no tenderness to her hips; she could fully extend and flex her hips. Dr. Garner found Plaintiff's cervical spine, arms, hands, knees, ankles, and feet were normal. Plaintiff had no muscle weakness; her sensation was intact (R. 202). Plaintiff reflexes were normal in her upper and lower extremities. Plaintiff could heel walk, toe walk, heel-to-toe walk, and squat "without difficulty." Dr. Garner's impressions were for osteogenesis imperfecta and sensorineural hearing loss (R. 203).

On February 17, 2006, a clinical report of Plaintiff's hearing was completed by Dr. Wetmore. He noted Plaintiff had undergone "a tympanoplastic approach" to evaluate her right ear "a couple years ago." Plaintiff was subsequently diagnosed with "ossicular fixation in the attic" and was fitted with a hearing aid. Plaintiff's audiogram showed a "borderline hearing loss in the left ear and a severe conducive hearing loss in the right ear that [were] unchanged from previous studies." His diagnosis was for "[l]arge conductive hearing loss, right ear." His plan of treatment was for Plaintiff to "[c]ontinue hearing aid or would require mastoid approach to free up the ossicles" (R. 206).

On February 20, 2006, an x-ray was made of Plaintiff's lumbar spine. It was compared to the x-ray made on May 16, 2005. It showed "mild anterior wedging with a little depression of the superior end plate of L1 vertebral body likely due to prior compression fracture." There was a "little relative

narrowing of L3-L4 disk and T12-L1 disk. There was a "little superior narrowing of the hip joints . . . likely . . . due to degenerative change." The impression was for L5-S1 spondylolisthesis and grade 1 anterolisthesis at L5-S1 (R. 241, 351).

Plaintiff's February 20, 2006, x-ray made of her left knee showed patella alta (R. 242, 350).

On February 20, 2006, Dr. Jones evaluated Plaintiff for her acute knee pain. Plaintiff stated she was "continuing to have difficulties, both secondary to mostly her back pain when she tri[ed] to do anything, but also more recently with her left knee." Dr. Jones' examination of Plaintiff revealed she was in "no major distress." He opined Plaintiff's back exam did "limit her motion and her mobility." Plaintiff's straight leg raising test was negative, although she expressed she had "some left knee pain." Plaintiff's trochanteric bursa was "irritated." Dr. Jones' examination of Plaintiff's knee showed "ligamentously stable anterior, posterior, and mediolateral." Dr. Jones' opined her knee x-ray "look[ed] normal." Dr. Jones' opined he thought Plaintiff's "knee pain [was] coming from her knee, not her hip." Dr. Jones thought Plaintiff was "probably unable to work just mostly secondary to her back problem, but also secondary to his [sic] knee problem." He referred Plaintiff to physical therapy and exercise program for treatment (R. 240, 348).

On February 21, 2006, Dr. Seegar, completed a Physical Residual Functional Capacity Questionnaire of Plaintiff (R. 208, 211). Dr. Seegar wrote he had been treating Plaintiff every six-to-twelve months and that he had "followed [Plaintiff] since early childhood." He wrote that Plaintiff's prognosis was "poor" and her symptoms for osteogenesis imperfecta included "occasional bone fractures; daily 'bad' pain left hip & upper leg"; rod in left femur; and back and knee pain. Dr. Seegar characterized Plaintiff's symptoms as daily pain in her left hip and leg at one on a scale of zero to ten; daily back pain at eight on a scale of zero to ten; and daily left knee pain at six to eight on a scale of

zero to ten. When asked to identify the clinical findings and objectives signs that supported his finding, Dr. Seegar wrote "see x-ray & MRI." When asked to describe the treatment and responses to that treatment of Plaintiff's osteogenesis imperfecta, Dr. Seegar wrote "[t]he pain arises from her osteogenesis imperfecta – [t]his is a genetic-life long problem" (R. 208).

Dr. Seegar wrote that Plaintiff was not a malingerer and that she had no emotional factors that contributed to her symptoms. He found Plaintiff's impairments were "reasonably consistent with the symptoms and functional limitations described" in his evaluation. Dr. Seegar opined Plaintiff's pain and symptoms would frequently interfere with her attention and concentration. He found Plaintiff was capable of "very low stress jobs." Dr. Seegar wrote that Plaintiff's pain was "best addressed by sitting but also some time spent up . . . " (R. 209). Dr. Seegar found Plaintiff could not walk for any distance; she could sit for ten minutes at a time before having to stand; she could stand for ten minutes at a time before having to sit; could sit, stand, and walk for less than two hours; and needed to walk every ten minutes for eight minutes at a time (R. 209-10).

Dr. Seegar found Plaintiff needed to change "positions at will from sitting, standing or walking." He opined Plaintiff would have to "often" take unscheduled, ten-minute breaks. Dr. Seegar found Plaintiff did not need to use a cane or other assistive ambulatory device; Plaintiff did not need to elevate her legs. Dr. Seegar found Plaintiff should rarely lift less than ten pounds and never lift ten, twenty, or fifty pounds. Dr. Seegar opined Plaintiff could rarely engage in sustained flexion of her neck, could frequently turn her head to her right and left, could frequently look up, and could occasionally hold her head in a static position (R. 210). Dr. Seegar found Plaintiff could rarely twist or climb stairs and could never stoop, bend, crouch, squat, or climb ladders. Dr. Seegar found Plaintiff had no significant limitations in reaching, handling or fingering. Dr. Seegar opined Plaintiff's

impairments would "likely . . . produce 'good days' and 'bad days.'" Dr. Seegar opined Plaintiff would likely be absent from a job for more than four days per month. Dr. Seegar wrote that Plaintiff's osteogenesis imperfecta would "eventually lead to deafness" and that Plaintiff's legs "occasionally . . . g[a]ve out," which caused Plaintiff to fall (R. 211).

On February 26, 2006, Fulvio Franyutti, a state-agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff. He found Plaintiff could occasionally lift and/or carry ten pounds; frequently lift and/or carry ten pounds, stand and/or walk for a total of at least two hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and push/pull unlimited (R. 213). Dr. Franyutti found Plaintiff could occasionally climb ramps and stairs, balance, stoop, and kneel. Dr. Franyutti found Plaintiff could never climb ladders, ropes, and scaffolds, crouch, or crawl (R. 214). Dr. Franyutti found Plaintiff had no manipulative, visual, or communicative limitations (R. 215-16). Dr. Franyutti found Plaintiff's exposure to wetness, humidity, fumes, odors, dusts, gases, and poor ventilation was unlimited. He opined Plaintiff should avoid concentrated exposure to extreme cold and heat, noise, and vibrations. He also opined that Plaintiff should avoid even moderate exposure to hazards (R. 216). Dr. Franyutti found Plaintiff was credible. He reduced her RFC to sedentary (R. 217). Dr. Franyutti opined that he did not "feel this pt [was] disabled from all occupations. She should be able to do any job that does not require physical labor" (R. 218). Dr. Franyutti reviewed Dr. Garner's February 15, 2006, IME of Plaintiff (R. 219).

Plaintiff's February 28, 2006, CT scan of her temporal bones was "unremarkable" (R. 238).

On March 1, 2006, Plaintiff underwent a right tympanomastoidectomy with ossiculoplasty. Dr. Wetmore's preoperative and postoperative diagnoses were for "maximum conductive hearing loss, right ear; probably due to malleus fixation in the attic"(R. 231-32).

On March 2, 2006, Dr. Wetmore wrote that, as a result of the right tympanomastoidectomy with ossiculoplasty, Plaintiff's "whole ossicular chain moved well, and [he was] hopeful that her hearing will improve significantly" (R. 233).

On March 23, 2006, Plaintiff underwent an audiogram. Plaintiff stated that "her hearing seem[ed] somewhat better." The audiogram showed "significant decrease in air bone gap in the right ear." Dr. Wetmore found "[p]ostop ossiculoplasty right ear with significant improvement of her hearing in that ear but still a persistent moderate hearing loss" and mild hearing loss in her left ear, "sensorineurally." Dr. Wetmore opined that "[t]his may be as good as she gets" (R. 229-30).

In an unsigned, undated Routine Abstract Form – Physical from a "treating source" from Pendleton Community Care, physical findings as to Plaintiff as of March 30, 2006, were noted. The person completing this form noted Plaintiff had osteogenesis imperfecta "OI type IV" since birth and had "suffered several fractures [due] to this problem" (R. 274). It was noted that Plaintiff's vision and speech were normal. Her hearing was abnormal, but no "comment" as to "any hearing problem" was included in the abstract. Plaintiff's legs were determined to be abnormal because they "bec[a]me numb and painful." Plaintiff's fine motor and gross motor abilities were normal. Plaintiff's joints were all normal, except those in her lower left extremities, which produced reduced ranges of motion . All Plaintiff's muscle bulk were normal (R. 275). The person who completed the Routine Abstract Form – Physical found Plaintiff's reflexes, sensory deficits, motor strength, coordination, mental status, respiratory functionings, cardiovascular, and digestive functions were normal (R. 276-77).

On May 15, 2006, Dr. Garner completed an Internal Medicine Examination of Plaintiff. Plaintiff's chief complaints were for "allegations of osteogenesis imperfecta and hearing loss." Plaintiff reported she had been diagnosed at birth with osteogenesis imperfecta. She informed Dr.

Stein that she had broken her left femur and had had a rod inserted. Plaintiff stated she "ha[d] fractured nearly every bone in her body in childhood. . .," including her wrists, fingers, toes, feet, ribs, and arms. Plaintiff reported she had suffered no recent fractures. Plaintiff reported "chronic pain, particularly in the left knee" for three months. Plaintiff described her knee pain as sharp, but not constant. Plaintiff's knee did not swell and was not stiff. Plaintiff reported an x-ray she had taken of the knee three months earlier was normal. Plaintiff reported back pain. She stated a recent x-ray showed "a spondylitic defect of some kind." Plaintiff described her back pain as "sharp and [felt] like needles." Plaintiff also reported to Dr. Garner that she experienced "numbness, tingling, and weakness in her legs." Plaintiff reported that "bending, sitting, standing, and lying flat exacerbate[d] her back pain and nothing [made] it better, except pain medication" (R. 287). Plaintiff stated he had been treated by a physical therapist for her back pain, "but it [the treatment] did not help" (R. 288).

Plaintiff informed Dr. Garner that she experienced hearing loss, which was "related to her osteogenesis imperfecta." Plaintiff stated she had undergone an ossiculoplasty and mastoidectomy of her right ear in March 2006, but that there had "been no improvement in her hearing." Plaintiff stated she had ordered a hearing aid but was "not yet supposed to wear it until she . . . had follow up for her hearing problems" (R. 288). Dr. Garner reviewed Dr. Wetmore's March 1, 2006, records relative to Plaintiff's ear condition and treatment (R. 289).

Plaintiff reported she experienced chest pains in her "mid-sternum and left ribs" for the past two years. Plaintiff stated it was not "brought on by exertion or stress" but was worsened by "bending over or lying flat." Dr. Garner noted the "tenderness" was "reproducible . . . with touch, so it appear[ed] to be more musculoskeletal than cardiac" (R. 288).

Plaintiff reported she medicated with Loratadine, Hydroxyzine, multivitamin, Patanol, Promethazine, Singulair, Triamcinolone, benzoyl peroxide, and Cleocin (R. 288).

Dr. Garner's review of Plaintiff's symptoms revealed "cough and wheezing," reported by Plaintiff, due to asthma and allergies (R. 288). Dr. Garner's review of Plaintiff's gastrointestinal, genitourinary, and neurologic systems produced normal results (R. 289).

Dr. Garner's physical examination revealed that Plaintiff's gait was normal. She walked unassisted. Plaintiff had no difficulty rising from the seated position. She could climb up on and down from the examination table. Plaintiff was comfortable while seated and supine. Dr. Garner observed that Plaintiff could "speak understandably and hear and follow instructions without difficulty." Plaintiff "did not have any obvious hearing deficit at 15 feet or beyond" (R. 289, 291). Plaintiff's vital signs, HEENT, and neck examinations were normal (R. 289-90). Dr. Garner's examination of Plaintiff's chest showed symmetrical excursion, lung fields clear to auscultation and percussion, no wheezes or rales, no rhonchi, symmetrical breath sounds, and no chest tenderness to palpation. Dr. Garner's examination of Plaintiff's cardiovascular system, abdomen, all extremities, cervical spine, arms, hands, ankles, and feet produced normal results (R. 290). Dr. Garner found Plaintiff's shoulders, elbows, wrists, hips, and cervical spine ranges of motion were normal (R. 293-94). Dr. Garner found Plaintiff's upper extremity strength and grip strength were 5/5. Her fine manipulation was normal (R. 293). Plaintiff's lower extremity strength was normal. Plaintiff's lumbar spine lateral flexion was normal; her lumbar spine flexion-extension was at thirty degrees with pain. Plaintiff's lumbar spine straight-leg raising test was positive at thirty degrees on the right and forty-five degrees on the left, with no radiation (R. 294, 291). Dr. Garner found Plaintiff's lumbosacral spine/hip examinations showed "no obvious reproducible tenderness or paravertebral muscle spasm of the

lumbar spine." Dr. Garner found Plaintiff's neurologic examination was normal; Plaintiff had "no evidence of weakness on manual muscle testing" and her "sensation appear[ed] intact." Plaintiff's "deep tendon reflexes were graded at 2+/4+ in the upper and lower extremities, and that [was] normal." Plaintiff could heel walk, toe walk, and heel-to-toe walk and squat (R. 291). Dr. Garner found Plaintiff had no crepitation or swelling in her left knee. She was able to flex and extend both knees "without difficulty." Plaintiff complained of left knee pain when she stood on one leg at a time (R. 291).

Dr. Garner's impression was for osteogenesis imperfecta tarda, conductive hearing loss, and atypical chest pain (R. 291).

On May 15, 2006, Dr. Garner ordered an x-ray of Plaintiff's chest. It was normal (R. 295).

Also on May 15, 2006, Plaintiff underwent an electrocardiogram for ectopic atrial rhythm. The unconfirmed analysis was "borderline abnormal" (R. 296-97).

On May 18, 2006, Thomas Stein, Ed.D., completed a mental status examination of Plaintiff. Plaintiff appeared for the evaluation "casually dressed, neat and clean" with her knee wrapped in an elastic bandage. Plaintiff stated she "worr[ied] all the time about everything. Stuff like bills, my mom's medical problems and my medical problems." Plaintiff stated she had weak bones and that her legs "g[a]ve out" on her, which caused her to fall (R. 282). Plaintiff stated she had "trouble with not being very patient" and she had been "pretty depressed." Plaintiff reported she had loss of hearing in her right ear and had "trouble hearing . . . if there [were] a crowd or much noise" (R. 283).

Plaintiff's presenting symptoms included sleep disturbances, frequent awakening, three or four crying episodes per week, poor energy level, "'down and lonely'" mood, phobic about "'the dark and wet roads,'" and rare panic attacks. Plaintiff reported her prescribing physician had "recently stopped

14

on her antidepressant." Plaintiff stated she'd received mental health treatment from 2004 until 2005 by her primary care physician with psychoactive medications (R. 283). Plaintiff informed Dr. Stein that she'd last work at "a training job" as a certified nursing assistant for six months in 2003 (R. 284).

Dr. Stein's mental status examination of Plaintiff revealed her attitude, behavior, and social interaction to be "cooperative, polite and subdued." Dr. Stein found Plaintiff maintained poor eye contact, had fair length and depth to her verbal responses, displayed no sense of humor, and engaged in "little spontaneous conversation." Plaintiff had fair conversation skills. Plaintiff's speech was "relevant, coherent and normal[ly] paced." Plaintiff was oriented, times four. Her mood was moderately depressed. Plaintiff's affect was "very subdued." Plaintiff had no thought process disturbances. She had no delusions, preoccupations, hallucinations, illusions, or obsessions. Plaintiff's immediate memory, recent memory, and remote memory were moderately deficient. Plaintiff's concentration was poor (R. 284).

Dr. Stein listed Plaintiff's objective symptoms as "cooperative, polite, very subdued, and moderately depressed while she evidenced poor memory and poor concentration." Dr. Stein found Plaintiff was of "low average intelligence" (R. 284). Dr. Stein diagnosed the following: Axis I – "pain disorder associated with general medical condition. Major depression, recurrent type, nonpsychotic"; Axis II – no diagnosis; Axis III – osteogenesis imperfecta. Her prognosis was fair (R. 284-85).

Plaintiff listed her daily activities as follows: arose at 9:00 a.m.; cared for her personal hygiene needs; showered; dressed; did "a little housekeeping"; watched "some" television; received visits from her mother, who helped her with her "heavy housekeeping"; returned to bed after her mother left her home; prepared food; watched more television. Plaintiff reported she ran errands with her mother and, if she did not leave the house with her mother, she remained home alone all day and retired at 9:00

p.m. Plaintiff stated she "rarely" cooked, "occasionally" cleaned, "regularly" washed dishes, never did laundry, never did yard work or gardened, never did automotive work, never carried firewood, and did not collect anything. Plaintiff reported her mother grocery shopped for her and her mother and boyfriend assisted her in completing her household chores. Plaintiff reported she "occasionally" drove and walked "short distances." Plaintiff did not attend church or belong to any clubs or organizations. She occasionally dated and ate in restaurants. Plaintiff visited relatives (R. 285).

Dr. Stein found Plaintiff to be "cooperative, polite, and moderately depressed." Dr. Stein found Plaintiff to be "moderately deficient in the social functioning arena." Dr. Stein found Plaintiff's concentration was moderately deficient; her persistence was mildly deficient; and her pace was moderately slow. Plaintiff could manage her own benefits, if she were awarded them (R.285).

On May 25, 2006, Plaintiff reported to Dr. Seegar that she had seasonal allergies. Dr. Seegar listed Plaintiff's medications as Hydroxyzine, Ortho Tri-Cyclen, a multivitamin, Patanol, Benzyl-Peroxide, and Triamcinolone. Plaintiff informed Dr. Seegar that she had been "evaluated by psychologist in Elkins, Dr. Stein, and they have recommended that she might need medication for situational depression." Plaintiff reported she was having difficulty "exercising secondary to pain in her left thigh and knee." She stated she had physical therapy scheduled for treatment of that pain. Dr. Seegar told Plaintiff that she should "take advantage of this and go for physical therapy as [he thought] . . . this could be very beneficial for her" (R. 340). Dr. Seegar stated that, due to her being "overweight," she "need[ed] to get exercise and watch her diet carefully" (R. 341).

On June 12, 2006, Bob Marinelli, Ed.D., completed a Psychiatric Review Technique of Plaintiff. He found she had affective and somatoform disorders (R. 302). Dr. Marinelli found Plaintiff's affective disorder was major depressive disorder (R. 305). Dr. Marinelli found Plaintiff's

somatoform disorder was pain disorder (R. 308). Dr. Marinelli found Plaintiff had mild restriction of activities of daily living; had moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace. Dr. Marinelli found Plaintiff had no episodes of decompensation (R. 312). Dr. Marinelli reviewed Dr. Stein's May 18, 2006, evaluation of Plaintiff in making his determinations (R. 314).

Also on June 12, 2006, Dr. Marinelli completed a Mental Residual Functional Capacity Assessment of Plaintiff. Dr. Marinelli evaluated Plaintiff's understanding and memory and found Plaintiff was not significantly limited in her ability to understand and remember very short and simple instructions. He opined Plaintiff was moderately limited in her ability to remember locations, work-like procedure and detailed instructions. Dr. Marinelli evaluated Plaintiff's sustained concentration and persistence and found Plaintiff was not significantly limited in her ability to carry out very short and simple instructions or to work in coordination with or proximity to others without being distracted by them. Dr. Marinelli found Plaintiff showed no evidence of limitation in her ability to sustain an ordinary routine without special supervision or make simple work-related decisions (R. 298). Dr. Marinelli opined Plaintiff was moderately limited in her ability to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual with customary tolerances, complete a normal work-day and work week without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods (R. 298-99). Dr. Marinelli evaluated Plaintiff's social interaction and found Plaintiff was not significantly limited in her ability to interact appropriately with the general public, ask simple questions or request assistance. Dr. Marinelli found there was no evidence that Plaintiff was limited in her ability to maintain socially appropriate behavior

and to adhere to basic standards of neatness and cleanliness. He opined Plaintiff was moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors. Dr. Marinelli evaluated Plaintiff's adaptation and found she was not significantly limited in her ability to be aware of normal hazards and take appropriate precautions. He found no evidence of Plaintiff's being limited in her ability to respond appropriately to changes in the work setting, to travel in unfamiliar places or to use public transportation. Dr. Marinelli opined Plaintiff was moderately limited in her ability to set realistic goals or make plans independently of others (R. 299).

Dr. Marinelli opined that Plaintiff's MRFC was "reduced by moderate limitations in memory, concentration, persistence, social functioning & judgement [sic]." Dr. Marinelli found Plaintiff had "the capacity for routine competitive employment involving short & simple instructions with low interpersonal & pressure demands" (R. 300).

On July 14, 2006, Plaintiff reported to Dr. West that she had injured her second and third fingers of her right hand when she "[got] her hand caught in a car door." Dr. West found "complete ROM of the" third finger" and "full extension of the" second finger. He observed "no bruising, no swelling," which he considered as "strange for having caught fingers in a car door." Dr. West found "[n]o true signs or symptoms of a crush type injury" (R. 339).

On July 26, 2006, Porfirio Pascasio, M.D., completed a Physical Residual Functional Capacity Assessment of Plaintiff. Dr. Pascasio found Plaintiff could occasionally lift and/or carry ten pounds, frequently lift and/or carry ten pounds, stand and/or walk for a total of at least two hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and push/pull unlimited (R. 317). Dr. Pascasio found Plaintiff could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. Dr. Pascasio found Plaintiff could never climb ladders, ropes, or scaffolds (R. 318).

Dr. Pascasio found Plaintiff had no manipulative, visual, or communicative limitations (R. 319-20). Dr. Pascasio found Plaintiff should avoid concentrated exposure to extreme cold and heat, noise and vibration. Dr. Pascasio found Plaintiff should avoid moderate exposure to hazards. Dr. Pascasio found Plaintiff was unlimited in her exposure to wetness, humidity, fumes, odors, dusts, gases, and poor ventilation (R. 320). Dr. Pascasio noted Plaintiff did not "require any assistance with personal needs or grooming"; could walk five-to-ten minutes before she needed to stop and rest; and could lift five-to-six pounds. Dr. Pascasio found Plaintiff credible (R. 321). Dr. Pascasio opined Plaintiff was "not disabled from all occupations" and could work at jobs that do "not require physical labor" (R. 322). Dr. Pascasio reviewed Plaintiff's March, 2006, audio evaluation, Dr. Garner's May, 2006, examination results, the May, 2006, chest x-ray, and the May, 2007, electrocardiogram (R. 323).

On August 29, 2006, Dr. Seegar noted, during an examination of Plaintiff for allergy symptoms, that Plaintiff's type IV osteogenesis imperfecta was "generally . . . the mild type." He wrote that Plaintiff had "not sustained any fractures recently though in the past she" had. Dr. Seegar found Plaintiff "seem[ed] to be doing okay without having had any recent broken bones." Dr. Seegar noted Plaintiff had reported that her "hearing seem[ed] to be fine" (R. 338).

An October 23, 2006, "study of [Plaintiff's] lumbosacral spine" was compared to the February 20, 2006, study. It showed "mild compression fracture deformity of the L1 vertebral body, unchanged compared to the prior study" and "L5 spondylolysis with associated L5-S1 spondylolisthesis," which was "essentially unchanged on flexion and nearly reduced on extension" (R. 362).

On October 23, 2006, a "swimmer's projection[]" "study of [Plaintiff's] thoracic spine" was made. It showed "preservation of vertebral body height throughout the thoracic spine without obvious

evidence of abnormal spinal subluxation. Anterior osteophytes [were] identified along the lower thoracic spine, likely associated with early degenerative disk changes" (R. 363).

On October 23, 2006, Dr. Jones corresponded with Dr. Seegar relative to Plaintiff's back pain. He wrote that Plaintiff's low back pain continued and that Plaintiff "continued not to do the exercises that she was shown in physical therapy which I do think she should do." Plaintiff informed Dr. Jones that she was experiencing "some new interscapular upper back pain that bother[ed] her more right now than what her lower back [did]." Dr. Jones' examination of Plaintiff revealed she was healthy and in no distress. She was "stiff on forward bending" and had "back pain localized probably about T4-T5 area in the middle of her back and also some down in her low lumbar spine." Plaintiff's hamstrings were "mildly tight." Dr. Jones wrote that he had x-rayed Plaintiff and the "x-rays appear[ed] the same as they have." Dr. Jones found in Plaintiff's "thoracic spine maybe some osteopenia but otherwise normal." Plaintiff's spondylolisthesis ha[d] not changed." Dr. Jones wrote the "flexion and extension films" were "stable, [were] not changing, and may not even be the cause of her problem." He informed Dr. Seegar that he instructed Plaintiff to continue with the exercise program (R. 360).

On November 2, 2006, Plaintiff reported to Dr. Seegar that she was "doing well, no injuries or fractures from her osteogenesis imperfecta" and "no change in her hearing over the last 12 months." Dr. Seegar noted that Plaintiff's "osteogenesis imperfecta . . . seem[ed] to be doing fine" (R. 337).

On November 2, 2006, Dr. Seegar completed a Physical Residual Functional Capacity Questionnaire of Plaintiff. Dr. Seegar noted he had "contact" with Plaintiff every three months and had "seen" her since she was three-years old. He wrote her diagnosis was "osteogenesis imperfecta Type IV" and her prognosis was "fair." Dr. Seegar noted Plaintiff's symptoms included a "history of fractures, presently with rod in [left] femur" and "significant back pain," for which Plaintiff was

receiving physical therapy. Dr. Seegar characterized Plaintiff's pain as located in her back at "midline from upper thoracic to lower thoracic," leg numbness with bilateral pain. Dr. Seegar noted the clinical findings and objective signs that support Plaintiff's symptoms and pain were "fractures in the past associated with the osteogenesis imperfecta" and "x-ray & other imaging studies." Dr. Seegar described the treatment Plaintiff received for her condition as "pin [in] [left] femur"; and physical therapy and "analgesics for back pain." Dr. Seegar opined Plaintiff's conditions would last "at least" twelve months as the osteogenesis imperfecta was congenital. He found Plaintiff was not a malingerer. He opined there were no "emotional factors" that "contribute[d] to the severity of [Plaintiff's] . . . symptoms and functional limitations" (R. 324). Dr. Seegar wrote that anxiety was a psychological condition that affected Plaintiff's condition. Dr. Seegar found Plaintiff's impairments were "reasonably consistent with the symptoms and functional limitations described in [the] evaluation." Dr. Seegar opined Plaintiff's "pain or other symptoms [were] severe enough to . . . frequently interfere with attention and concentration" that were "needed to perform even simple work tasks." Dr. Seegar found Plaintiff was incapable of even "'low stress'" jobs because she experienced "significant pain associated with prolonged sitting, standing, walking" (R. 325).

Dr. Seegar found Plaintiff could not walk any city blocks. She could sit and stand for fifteen minutes (R. 325). Dr. Seegar opined Plaintiff could sit, stand, and walk less than two hours in an eight-hour workday. He found Plaintiff had to walk every fifteen minutes for five minutes during an eight-hour workday. Dr. Seegar opined Plaintiff would have to shift positions at will from sitting, standing or walking every fifteen to thirty minutes of work during an eight-hour workday and would have to take unscheduled breaks during every fifteen to thirty minutes for fifteen to twenty minutes at a time in an eight-hour workday. Dr. Seegar found Plaintiff's legs would not have to be elevated

during the day and she would not have to use a cane or assistive device. Dr. Seegar found Plaintiff could never lift ten, twenty, or fifty pounds and could rarely lift less than ten pounds. Dr. Seegar opined Plaintiff could rarely look down, occasionally turn her head to the right or left, occasionally look up, and rarely hold her head in a static position (R. 326). Dr. Seegar found Plaintiff could rarely twist and crouch and never stoop, bend, climb ladders, or climb stairs. Dr. Seegar opined Plaintiff's impairments would "'likely . . . produce'"good days'" and "'bad days.'" Dr. Seegar opined Plaintiff would have to miss more than four days of work per month due to her symptoms (R. 327).

Dr. Seegar completed a West Virginia Department of Health and Human Resources Medical Review Team General Physical form on January 25, 2007. Dr. Seegar wrote that osteogenesis imperfecta caused "poor structural support of the boney skeleton," from which "chronic pain can develop from extended periods of standing or sitting" (R. 330).

On March 16, 2007, Mr. Vandevander wrote that Plaintiff had "been found to have a mild to moderate sensorineural loss of hearing on the left side with a severe to profound loss on the right side." Mr. Vandevander wrote that Plaintiff's "use of a Siemens Prisma 2 digital hearing aid fitted to the right ear provide[d] [her] with significant improvement in hearing on the right side, however, [she] still ha[d] a mild loss of hearing bilaterally even with its use." Mr. Vandevander wrote that, "[w]ith the use of amplification," Plaintiff's "hearing [was] better but [her] ability to hear and understand running conversational speech in most real world listening situations [was] rather reduced depending upon the listening situation." Mr. Vandevander recommended that Plaintiff "not . . . place [herself] in a work situation that require[d] [her] to interact with the general public, unless that listening environment ha[d] extremely limited background noise" (R. 342).

On June 21, 2007, Plaintiff had an x-ray made of her left knee. The views were compared to Plaintiff's February 20, 2006, left knee x-ray. It showed no "[a]cute bony abnormality." Plaintiff's "visualized joint spaces" were "preserved." There was "more knee flexion on the current provided lateral view, and the patella is not as high in position as compared to the previous study" (R. 358).

Plaintiff's June 21, 2007, thoracic spine x-ray showed "[a]symmetric narrowing of the T9-10 disk space with slight exaggerated kyphosis in this region" and "anterior cortical margin of the T10 vertebral body [was] not well visualized on the current provided lateral view" (R. 359).

On June 21, 2007, Dr. Jones wrote to Dr. Seegar that Plaintiff's low back pain, upper thoracic back pain, and left knee pain continued. Dr. Jones noted that he'd reviewed the "notes from the physical therapist and it sound[ed] like they have been doing a good job at working with her, but it sound[ed] like she has not been making any progress at all." Dr. Jones reviewed the x-ray of Plaintiff's knee and found "it still looked totally normal with no signs of any problems whatsoever." Dr. Jones reviewed the x-ray of Plaintiff's thoracic spine; he "did not see any changes from when we x-rayed her back in February." Dr. Jones ordered a bone scan and referred Plaintiff to Dr. Epstein for a consultative examination about relieving Plaintiff's back pain (R. 357).

On June 28, 2007, Dr. Jones wrote to Dr. Seegar that Plaintiff's bone scan of this date was "entirely normal." Dr. Jones wrote that they "did her entire skeleton . . . [and] there [was] nothing that [lit] up in her knee, and there [was] nothing that [lit] up in her back healthy." Dr. Jones opined he did "not think she ha[d] had an acute compression fracture or other problem." Dr. Jones opined he thought "mostly she ha[d] some back muscle problems because she tend[ed] to be a little round back . . . ." Dr. Jones found Plaintiff "need[ed] to work on some back extension exercises" as that "would help

some." He found Plaintiff was "awfully deconditioned," and he "[thought] . . . [deconditioning] may be a problem." Dr. Jones referred Plaintiff to Dr. Epstein for evaluation (R. 356).

On July 17, 2007, Dr. Epstein, of the WVUH Spine Center, examined Plaintiff at the request of Dr. Jones. Plaintiff reported to Dr. Epstein that, "at times, she [felt] that her left hip and knee bother[ed] her and that her leg [was] going to go out from under her." Plaintiff reported she did "not know when this all first started." Plaintiff stated she had had "multiple falls and car wrecks, but no true fractures." Plaintiff stated "Tylenol help[ed] and physical therapy helped a little bit, as well as muscle rubs." Plaintiff attended physical therapy "in 2007 for two months" for two to three times per week. Plaintiff stated her pain was made worse by "riding in a car for long periods of time, sitting or doing any other activity as well." Plaintiff could walk ten to fifty feet "without any problem" (R. 353).

Dr. Epstein noted Plaintiff's June, 2007, bone scan "was read as anterior inferior aspect T10 superior endplate increased radio tracer," but that "Dr. Jones did not feel there was a fracture." Dr. Epstein opined she "was not impressed with it either." Dr. Epstein noted that, in October, 2007, Plaintiff had "x-rays, flexion and extension of the lumbosacral spine, which show[ed] mild wedging versus a Schmorl's node at L1 area which [has] not changed from previous studies according to radiology." Dr. Epstein wrote that Plaintiff had "L5 spondylolysis associated with L5-S1 spondylolisthesis grade 1." Dr. Epstein wrote that Plaintiff's June, 2007, thoracic spine x-rays showed "some disk space narrowing at T9-10." A "swimmer's view . . . showed some anterior osteophytes along the lower thoracic spine" which were "indicative of early degenerative disk disease" (R. 353).

Dr. Epstein noted Plaintiff's past medical history was "significant for osteogenesis imperfecta, atrophic eczema, shortness of breath [for] unknown reasons, seasonal allergies, pain in her left leg,

[pain] in her knee and her hip and hearing loss." Dr. Epstein noted Plaintiff's medications included Tylenol, muscle rubs, Nasonex, Hydroxyzine, birth control pills, Singulair and Clobetasol (R. 353).

Plaintiff reported to Dr. Epstein that her "right eye [was] not real good." She was "deaf in the right ear." She had chest pain. She experienced shortness of breath upon exertion. She "complain[ed] of left-sided back pain, thoracic and lumbar pain." She "complain[ed] of numbness and achiness in the left knee and hip." Plaintiff stated she had depression but was not prescribed any medications. Plaintiff stated she experienced interrupted sleep due to "difficulty lying on her left side" (R. 354).

Dr. Epstein's examination of Plaintiff revealed she was "melancholy"; had no respiratory distress; HEENT within normal limits; no clubbing, cyanosis or edema of her extremities; decreased hearing in left ear, "otherwise cranial nerves 2-12 are grossly intact"; motor strength was "5/5 throughout"; intact sensation throughout; +2 deep tendon reflexes; antalgic gait over left lower extremity; decreased lordosis of low back; left-sided low back pain with flexion "more so than with extension"; mid-thoracic pain with right lateral flexion; left-sided low back pain with left lateral flexion; negative Faber sign; complained of left groin and hip pain; left hip tenderness to palpation; straight leg raising test on left at seventy degrees with complaints of low back pain; straight leg raising test on the right at seventy degrees with no complaints of low back pain; negative SI compression; negative PSIS palpation; negative sciatic notch; negative ischial tuberosity; tenderness to palpation of "all the spinous processes from the mid thoracic to the lumbosacral spine"; muscle tightness on the thoracic left and lumbar spine (R. 354).

Dr. Epstein's impressions were for "mechanical low back pain secondary to left hip bursitis and left knee pain with gait deviations"; lumbar sprain; developmental spondylolisthesis at L5-S1, grade 1, from spondylolysis at L5; mild degenerative disk disease in the thoracic spine; thoracic sprain;

and "left greater trochanteric bursitis." Dr. Epstein recommended Plaintiff do "hip exercises on her side in the prone position only, knee exercises in a sitting position, stop her previous exercises, do extension exercises . . . and a walking program with tennis shoes on . . . ." Dr. Epstein recommended Plaintiff begin her walking program at one-half mile. Dr. Epstein "taught [Plaintiff] how to sit correctly in a car with a lumbar roll." Dr. Epstein opined Plaintiff was "somewhat deconditioned," for which Dr. Epstein recommended Plaintiff "build up her tolerance to exercise" by doing extension exercises for her low back. Dr. Epstein opined Plaintiff could "work at a job where she can stand and sit at will" and "may need to go to a trade school to learn a trade" (R. 354).

<u>Submitted at the Administrative Hearing</u>

Reports from an unidentified source were submitted at the administrative hearing. They appear to be notes from yearly optometry examinations of Plaintiff (R. 364-75). On December 2, 1998, the optometrist noted Plaintiff presented with the "usual complaints." The optometrist noted Plaintiff reported she was not wearing glasses because "she didn't need them" (R.374). On January 7, 1998, Plaintiff reported she did "want to wear spectacles" (R. 373). On September 5, 2000, the optometrist noted Plaintiff did not wear her prescribed glasses and that she "probably want[ed] to try" contact lenses (R. 372). On October 23, 2001, Plaintiff informed the optometrist that she did not wear the prescribed spectacles and wanted contact lenses. Plaintiff had no vision complaints (R. 371). On March 14, 2003, Plaintiff reported she experienced no pain or discomforted associated with her eyes. Plaintiff stated her old spectacles gave her headaches. Plaintiff reported her eyes became "scratchy/dry." The optometrist treated Plaintiff with "Tears Again" gel and Systane (R. 370). On November 21, 2003, Plaintiff reported to the optometrist that she thought medication was "making [her vision] blurry" (R. 369). On November 29, 2004, Plaintiff made no complaints to the optometrist.

The optometrist noted Plaintiff had a tendency to have eye spasms. No eye glass prescription was made (R. 368). On September 8, 2005, Plaintiff presented to the optometrist with itchy and red eyes caused by allergies. No prescription was issued (R. 367). On March 12, 2007, Plaintiff complained to the optometrist of "glare disability" with "night driving." She had no pain or discomfort. Plaintiff informed the optometrist she "want[ed] to try" contact lenses. She was fitted for contact lenses; the fit was good. She was comfortable wearing the contact lenses (R. 366). On March 13, 2007, Plaintiff returned to the optometrist. She said she experienced red eyes and pain. The optometrist wrote Plaintiff had corneal abrasions and prescribed Vigamox. The optometrist instructed Plaintiff to return in one week or to telephone if she experienced any problems (R. 364).

Evidence Submitted to Appeals Council

On April 2, 2008, Dr. Sheap wrote a letter addressed "To Whom It May Concern." Dr. Sheap wrote that he had "had treated Plaintiff "on a number of occasions for treatment of atopic dermatitis." Dr. Sheap treated Plaintiff's dermatitis with Hydroxyzine, which could "cause significant drowsiness to the point that its use may interfere with driving and with the operating of powered machinery." Dr. Sheap wrote that he had "warned [Plaintiff] of this potential" side effect to the medication and instructed her to not drive or operate machinery after taking the medication (R. 375G).

Administrative Hearing

On October 5, 2007, ALJ McDougall conducted an administrative hearing. Plaintiff testified that she wanted to attend college but did not due to her hearing loss (R. 380). Plaintiff stated her "bone disease," which "caused [her] not being able to stand up long without having to either sit down" or "sit without standing, and . . . [her] legs would buckle up from under [her]," prevented her from working (R. 381). Plaintiff testified she had been diagnosed with atopic eczema, which caused her to itch and break out with a rash (R. 384). Plaintiff's counsel stated that "one of the doctors . . . indicated that .

. . a susceptibility to nickle and some other metal . . . [was] a result of the osteogenesis imperfecta" and "may cause the skin rashes" (R. 385). Plaintiff testified her right ear deafness was caused by osteogenesis imperfecta. Plaintiff stated she could hear "okay" with her left ear (R. 386). Plaintiff testified she had asthma and was allergic to dust and "certain perfumes" (R. 387). Plaintiff testified her eyes were "really sensitive to light . . . at night" (R. 395).

Plaintiff stated she could not walk far; she testified she could walk "around the [grocery store] aisle and then [she would] have to lean on the cart or something." Plaintiff testified she could stand for "maybe five minutes" and then her "legs would start getting numb and then [she would] have to sit down." Plaintiff stated she could sit in a chair, with back support, for "a couple of minutes" (R. 382). Plaintiff testified her right hand "want[ed] to draw every now and then." Plaintiff could use a knife and fork with her right hand. Plaintiff stated she could "lift maybe two . . . [text books] and then [her] back would start hurting [her] or something" (R. 383).

Plaintiff testified she experienced both pain and weakness from osteogenesis imperfecta (R. 384). Plaintiff stated her pain was located in the center of her back and left hip and was constant. Plaintiff testified that running and lifting worsened her pain. Plaintiff stated she treated her pain with Tylenol (R. 384). Plaintiff testified she had engaged in physical therapy for treatment for osteogenesis imperfecta "for about a year," but it had not "helped [her] back much" (R. 385). Plaintiff testified that she had a rod placed in her left femur when she was two years old, which caused "real bad pain," cramps in her knee, and her leg to buckle (R. 394-95). Plaintiff stated she experienced these symptoms two or three times daily (R. 395). Plaintiff stated she had spoken to her physician about the condition in her right hand, "but he [the doctor] really don't [sic] pay that much attention to it" (R. 383). Plaintiff stated she medicated the atopic eczema with Hydroxyzine, which caused her to be sleepy (R.

384).  Plaintiff testified she experienced rash outbreaks on a daily basis over her "whole body, [her] back, [her] arms, [her] legs, stomach" (R. 395)  Plaintiff stated she wore a hearing aid in her right ear, she was not wearing it at the hearing because it was broken, and that, when she wore the hearing aid, it "help[ed]" her to "half hear" with her right ear (R. 387).  Plaintiff testified she treated asthma and allergies with Nasonex and Singulair and that her "put[ting] on a fan or something . . . help[ed]" alleviate those symptoms (R. 388).  Plaintiff testified her light sensitivity condition was being treated with contacts, which "help[ed] . . . a little bit" (R. 396).  When she was asked by the ALJ if she had "any side effects from any of the medicines" she took, Plaintiff responded "no" (R. 388).

Plaintiff testified she lived alone but that her mother would stay with her and help her clean her house (R. 388-89).  Plaintiff stated she swept until her "back start[ed] hurting [her]" and then her mother would finish the chore.  Plaintiff testified she fed her dog and cooked food in the microwave.  Plaintiff stated she "[hung] out . . . talking with [her] friends or being with [her] mom" (R. 389).  Plaintiff stated she did not shop at malls; she grocery shopped with her mother; she would go to church and out to dine with her mother when invited.  Plaintiff testified she was a licensed driver.  Plaintiff stated she did not go out to the movies or to club meetings.  Plaintiff stated she watched television and read books (R. 390).  Plaintiff testified she "[tried] to walk" for exercise (R. 391).  Plaintiff stated she "used to" attempt to be rehired as a cook at a restaurant where she worked as a senior in high school, but was told that, because she complained of climbing stairs, which caused her back and legs to hurt, she was not hired (R. 391-92).  Plaintiff testified she had attempted to be hired as a nursing home care giver, but, because "the lifting and stuff . . . tired [her] out," she "couldn't do it" (R. 392).  Plaintiff testified that the Department of Vocational Rehabilitation was "supposed to continue looking" for jobs for her to perform (R. 393).

The ALJ asked the VE the following hypothetical question:

> If we assume a person of the same age, education, and work experience as the Claimant, but assume a hypothetical person who's limited to light work as that's defined. But assume a person would have to be able to change positions briefly, by briefly I mean just by a minute or two, at least every half hour, be no climbing ladders, ropes, scaffolds, stairs, or ramps, no more than occasional balance, stoop, kneel, crouch, or crawl, no exposure to extremes of heat, cold, wetness, or humidity. Jobs should generally be in a . . . controlled air environment with no exposure to extremes of fumes, dusts, gases, or other respiratory irritants, no exposure to significant work place vibrations, and no exposure to significant work place hazards, like heights or dangerous moving machinery. And the person should not have to have, no, no very good hearing required. And the person, there should be no significant background noises. Well, what I mean is, if a person is receiving instructions, they should be able to work and receive instructions where there are no significant background noises when they're receiving the instructions. And . . . they should be able to receive instructions face to face. Would there be any jobs such a person could do at the light or sedentary level unskilled work? (R. 397-98).

The VE responded that the light job of mail clerk, 202,000, nationally, and 2,300 regionally, reduced by half due to the hypothetical and the inclusion of the changing position every half hour requirement, would be available. The light job of garment sorter, 178,000, nationally, and 1,500, regionally, reduced in half due to the hypothetical and the requirement that the person change positions every half hour, would be available (R. 398). The sedentary job of general office clerk, 299,000, nationally, and 9,000, regionally, would be available. The sedentary job of addresser/stuffer, 240,000, nationally, and 2,000, regionally, would be available. The VE testified that a person could be absent for between one and two days per month and still have these jobs available to her (R. 399). Under questioning by the Plaintiff's counsel, the VE testified that the mail clerk job could require the use of a metal machine; the garment sorter job did not require the use of machines; the addresser/stuffer "may use some type of machine that stuffs envelopes"; the office clerk "would be using a telephone and maybe postage machines . . . [and] photocopy" machines (R. 400). The job of office clerk may require the replace of copier toner (R. 400-01).

# III. ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 416.920 (1997), ALJ McDougall made the following findings:

1.  The claimant has not engaged in substantial gainful activity since August 31, 2005, the application date (20 CFR 416.920(b) and 416.971 *et seq*) (R. 18).

2.  The claimant has the following severe impairments: atopic eczema; blurred vision at night; osteogenesis imperfecta, a bone disease causing weakness and pain; deafness in her right ear; a rod in her left leg since age 2 (20 CFR 416.920(c)) (R. 18).

3.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926) (R. 21).

4.  Based on all available evidence, the undersigned finds that the claimant retains the residual functional capacity to perform the exertional demands of light work, or work which requires maximum lifting of twenty pounds and frequent lifting ten pounds; some light jobs are performed while standing, and those performed in the seated position often require the worker to operate hand or leg controls. (20 C.F.R. §§ 404.1567 and 416.967). In addition, the claimant has the following non-exertional limitations: she must be able to briefly (one to two minutes) change positions at least every 30 minutes; she can do no job that requires her to climb ladders, ropes, scaffolds, stairs or ramps; she can do no job requiring more than occasional balancing, stooping, kneeling, crouching, or crawling; she can do no job which requires exposure to extremes of heat, cold, wetness or humidity; she can do no job unless it is in a controlled environment; she can do no job that requires exposure to extremes of fumes, dusts, gases, or other respiratory irritants; she cannot work in areas of significant vibrations; she cannot work around environmental hazards such as dangerous, moving machinery, or unprotected heights; she cannot do any job that requires good hearing acuity; she cannot work in areas of significant background noises while receiving instructions and should be able to receive oral instruction face-to-face; and she must be able to miss up to one day of work per month (R. 22).

5.  The claimant has no past relevant work (20 CFR 416.965) (R. 24).

6.  The claimant was born on March 7, 1985 and was 20 years old, which is defined as a "younger individual" within the meaning of the regulations, on the date the application was filed (20 CFR 416.963) (R. 24).

7.    The claimant has at least a high school education and is able to communicate in English (20 CFR 416.963) (R. 24).

8.    Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968) (R. 24).

9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.960(c) and 416.966) (R. 25).

10.   The claimant has not been under a disability, as defined in the Social Security Act, since August 31, 2005, the date the application was filed (20 CFR 416.920(g))(R. 26).

## IV. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990), (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Secretary's decision, the reviewing court must also consider whether the administrative law judge applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Contentions of the Parties

Plaintiff contends:

1. The ALJ erred because he improperly rejected all medical opinions favorable to Plaintiff's claim without conducting the required analysis of such opinions.

2. The ALJ erred because the residual functional capacity finding is not supported by the evidence of record.

3. The ALJ erred because he improperly considered Plaintiff's credibility and engaged in selective citation when doing so.

4. The ALJ erred because he failed to address Plaintiff's "severe" mental impairment and resulting work-related limitations.

5. The new and material evidence submitted to the Appeals Council indicates Plaintiff suffers significant side effects from her prescription medication that would seriously erode her residual functional capacity.

The Commissioner contends:

1. Substantial evidence supported the Commissioner's decision that Plaintiff did not prove disability under the act.

2. The ALJ properly weighed the medical opinion evidence in assessing Plaintiff's RFC for a limited range of light and sedentary work.

3. Substantial evidence supported the ALJ's finding that Plaintiff's allegations of intense, persistent, and debilitating symptoms were not entirely credible.

## C. Opinion Evidence

Plaintiff asserts that the ALJ erred because he improperly rejected all medical opinions favorable to Plaintiff's claim without conducting the required analysis of such opinions. Defendant asserts the ALJ properly weighed the medical opinion evidence.

Plaintiff argues that the ALJ did not comply with the following Fourth Circuit mandate:

The ALJ was obligated to evaluate and weigh medical opinions "pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the

supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." Courts typically "accord greater weight to the testimony of a treating physician because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant." *Hines v. Barnhart*, 453 F.3d 559, 563 (2006).

Plaintiff asserts the ALJ did not follow step four of *Hines*, id., inasmuch as he relied on an opinion of a "general practitioner . . . from Pendleton Community Care," regarding "seasonal allergies and various other non-disabling periodic conditions," to discredit the opinions of Dr. Seegar (Plaintiff's brief at p. 6). The ALJ, contrary to Plaintiff's assertion, did examine the consistency of Dr. Seegar's opinions.

In his decision, the ALJ wrote the following:

The undersigned also accords less weight to the opinions in Exhibits B10F, B20F and B21F, which do not appear to be substantially supported by the finding in Exhibit B22F. In Exhibits B10F and B20F, Dr. Seegar opined that the claimant, essentially, could not perform even the exertional requirements of sedentary work, and that her pain was so frequent that she could not cope with work stress, and that she would miss up to four days of work per month. His notes of treatment for the claimant at Exhibit B22F, however, do not support this opinion. They showed that the claimant was in no distress during examinations of her back and leg. The claimant told Dr. Seegar that she was doing well as of November 2, 2006, and following a physical examination he noted that "as far as her osteogenesis imperfecta, it seems to be doing fine" (Exhibit B22F/7). In August of 2006, his findings were similarly benign (Exhibit B22F/6). Dr. Seegar's notes do not support his conclusions in Exhibits B10F and B20F, and no explanation for the discrepancy appears in evidence. Moreover, the objective medical evidence, taken as a whole, also does not appear to support his extreme findings in Exhibits B10F and B20F, and also in B21F. For example, the claimant's medical provider in December of 2005, indicated that the claimant was not disabled from all work, but had limitations on her ability to do physical labor (Exhibit B4F). While not perfectly specific, this seems a reasonable conclusion from the evidence. For these reasons, the undersigned has accorded the opinions of Dr. Seegar less weight (R. 24).

The above opinions, provided by Dr. Seegar and reviewed and evaluated by the ALJ, represent all the treatment notes and the medical reports submitted by Dr. Seegar. As noted by the ALJ, the opinions of Dr. Seegar, found in two Physical Residual Functional Capacity Questionnaires

and a General Physical (Adult) form, were not supported by Dr. Seegar's treatment notes. In those questionnaires, Dr. Seegar found, in February, 2006, that Plaintiff was capable of "very low stress jobs." Plaintiff's pain was "best addressed by sitting but also some time spent up . . . " (R. 209). Plaintiff could not walk for any distance; she could sit for ten minutes at a time before having to stand; she could stand for ten minutes at a time before having to sit; could sit, stand, and walk for less than two hours; and needed to walk every ten minutes for eight minutes at a time (R. 209-10). Plaintiff needed to change "positions at will from sitting, standing or walking." Plaintiff would have to "often" take unscheduled, ten-minute breaks. Plaintiff should rarely lift less than ten pounds and never lift ten, twenty, or fifty pounds. Plaintiff could rarely engage in sustained flexion of her neck, could frequently turn her head to her right and left, could frequently look up, and could occasionally hold her head in a static position (R. 210). Plaintiff could rarely twist or climb stairs and could never stoop, bend, crouch, squat, or climb ladders. Plaintiff would likely be absent from a job for more than four days per month (R. 211). In November, 2006, Dr. Seegar opined, in the second questionnaire he completed, Plaintiff was incapable of even "'low stress'" jobs because she experienced "significant pain associated with prolonged sitting, standing, walking" (R. 325). Plaintiff could not walk any city blocks. She could sit and stand for fifteen minutes (R. 325). Plaintiff could sit, stand, and walk less than two hours in an eight-hour workday. Plaintiff had to walk every fifteen minutes for five minutes during an eight-hour workday. Plaintiff would have to shift positions at will from sitting, standing or walking every fifteen to thirty minutes of work during an eight-hour workday and would have to take unscheduled breaks during every fifteen to thirty minutes for fifteen to twenty minutes at a time in an eight-hour workday. Plaintiff could never lift ten, twenty, or fifty pounds and could rarely lift less than ten pounds. Plaintiff could rarely look

down, occasionally turn her head to the right or left, occasionally look up, and rarely hold her head in a static position (R. 326). Plaintiff could rarely twist and crouch and never stoop, bend, climb ladders, or climb stairs. Plaintiff would have to miss more than four days of work per month due to her symptoms (R. 327).

Plaintiff's assertion that the ALJ's "clever trick" to consider only those treatment notes for Plaintiff's seasonal allergies by a general practitioner to discredit Dr. Seegar's opinions is without merit (Plaintiff's brief at p. 6). The ALJ considered that Dr. Seegar noted, on August 8, 2006, that Plaintiff's osteogenesis imperfecta was "generally ... the mild type." He found Plaintiff had not "sustained any fractures recently . . . ." Dr. Seegar opined that Plaintiff "seem[ed] to be doing okay without having had any recent broken bones." Plaintiff reported her hearing "seem[ed] to be fine" (R. 23, 338). The ALJ also considered that Dr. Seegar noted, on November 2, 2006, that Plaintiff presented for a "check up" for "osteogenesis imperfecta type 4 and seasonal allergies." Plaintiff reported she was "doing well," had experienced "no injuries or fractures from her osteogenesis imperfecta," and that her hearing was stable. Dr. Seegar, upon examination of Plaintiff, found her hearing was intact and her extremities had "active full ROM in both upper and lower extremities." He opined that, "[a]s far as her osteogenesis imperfecta, it seems to be doing fine. Continue with current management and follow up with orthopedic doctor" (R. 24, 337). These findings do not support Dr. Seegar's findings in the questionnaires and general physical report.

Plaintiff also argues that Dr. Seegar based his opinions found in the questionnaires and report on the opinions of Dr. Jones, Plaintiff's orthopedic physician (Plaintiff's brief at p. 7). That assertion, too, is without merit. In the February, 2006, questionnaire, Dr. Seegar identified the "x-rays & MRI" as the clinical findings and objective signs on which he based his findings (R. 208).

He did not write anywhere in the report that he based his findings on information provided to him by Dr. Jones (R. 208-11). In Dr. Seegar's November, 2006, questionnaire, he did not write that he based his findings on the opinions or records of Dr. Jones; he wrote that the clinical findings and objective signs that supported his findings were "fractures in the past associated with her osteogenesis imperfecta. X-ray and other imagery studies" (R. 324, 324-27). The ALJ's decision to provide less weight to the opinions of Dr. Seegar is supported by substantial evidence.

The ALJ found Dr. Jones opinion was not supported by objective medical evidence. Plaintiff asserts that the ALJ "rejected" Dr. Jones' opinion because Dr. Jones "was unsure what her true problems were because her MRI and X-rays showed normal results," which was a "misrepresentation of what Dr. Jones actually said" (Plaintiff's brief at p. 7). The ALJ full analysis of Dr. Jones' opinion that Plaintiff was disabled is as follows:

> The undersigned also accords less weight to the opinions in Exhibit B2F/1. The claimant's orthopedist, Dr. Jones, opined that the claimant "is disabled and unable to work mostly due to the problems relative to her back pain" (Exhibit B2/F1). Dr. Jones, report, however, indicated that the claimant could do activities that she felt comfortable doing, and indicated that he was unsure what her true problems were because her MRI and X-rays showed normal results. He therefore was unable to provide objective medical evidence to support his opinion regarding her limitations (R. 24).

In her brief, Plaintiff refers to the ALJ's statement that Dr. Jones "was unsure what her true problems were because her MRI and X-rays showed normal results" (R. Plaintiff's brief at p. 7; R. 24). Plaintiff asserts that Dr. Jones actually wrote "[s]he did have an MRI, I understand, and she was told it was normal; although, we do not have that study to review" but the studies should have shown "a spondylitic defect because . . . she definitely does have a spondylitic defect with a mild spondylolisthesis of grade I" (Plaintiff's brief at p. 7; R. 170). As noted above, the ALJ found Dr. Jones' opinion that Plaintiff was disabled was not supported by the medical tests and laboratory

findings. The written statement in question can be located in Dr. Jones' May 16, 2005, letter to Dr. Kim. In that letter, in addition to writing the Plaintiff had an x-ray taken, that he had not seen it, and that it had to have shown that Plaintiff had spondylitic defect with a mild spondylolisthesis of grade I, Dr. Jones wrote the following: "I am not sure with her complaints that with a normal MRI and normal x-rays that we can identify exactly what her problem is" (R. 170). The undersigned finds the ALJ did not misrepresent Dr. Jones' May, 2005, statement.

Dr. Jones' opinion that Plaintiff was disabled is not supported by laboratory testing and clinical findings in the record. The ALJ considered Plaintiff's February 20, 2006, lumbar spine x-ray, which showed "'mild anterior wedging' with little depression of the superior end plate from her prior compression fraction, along with narrowing of the hip joints due to degenerative changes" (R.19); the October 23, 2006 x-ray of Plaintiff's thoracic spine, which showed "'maybe some osteopenia'" and which was reviewed by Dr. Jones (R. 20); the October 23, 2006, x-ray of Plaintiff's lumbosacral spine, which showed "mild deformity of the L1 vertebral body from a compression fracture, unchanged from a previous study, and an L5 spondylolysis with L5-S1 spondylolisthesis," which was interpreted by Dr. Jones and which, it was noted, was "essentially unchanged on flexion and [was] nearly reduced on extension" (R. 20, 362); Plaintiff's October 23, 2006, thoracic spine x-ray, which showed "no obvious evidence of abnormal spine subluxation, and only evidence of earlier degenerative changes" and was acknowledged by Dr. Jones (R. 20); the June 21, 2007, left knee and thoracic spine x-rays, which were reviewed by Dr. Jones, and "showed no abnormalities or causes for her alleged [knee] pain" (R. 21); and the June 28, 2007, whole body bone scan, which was ordered and reviewed by Dr. Jones, which was "completely normal" (R. 21). It is evident that

Plaintiff was positive for L5 spondylolysis and L5-S1 spondylolisthesis. Substantial evidence supports the ALJ's decision to provide less weight to the opinion of Dr. Jones.

The opinion of Dr. Seegar as to Plaintiff's inability to work and the opinion of Dr. Jones that Plaintiff is disabled are issues reserved to the Commissioner. Such a finding is an administrative finding that is dispositive of a case; *i.e.*, that would direct the determination or decision of disability. A statement by a medical source that a claimant is "disabled" or "unable to work" does not mean that the Commissioner will determine that the claimant is disabled. Section 404.1527(3)(1) expressly provides that the Commissioner "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." Finally, "a statement by a medical source that [a person] [is] 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." 20 C.F.R. §4041527(e)(1). Such opinions of Drs. Seegar and Jones cannot, therefore, be accorded controlling weight or even any special significance.

The ALJ did not ignore the opinions of "not one, but two" state agency physicians, as asserted by Plaintiff (Plaintiff's brief at p. 5). The ALJ clearly addressed four opinions by two state agency physicians and a state agency psychologist in his decision: the Physical Residual Functional Capacity assessment of Dr. Franyutti; the Mental Residual Functional Capacity Assessment and the Psychiatric Review Technique of Dr. Marinelli; and the Physical Residual Functional Capacity Assessment of Dr. Pascasio (R. 212-19, 298-01, 302-15, 316-23). Plaintiff asserts that the ALJ "rejected these opinions [outright] and did not cite to a single piece of evidence," as required by the Fourth Circuit. *Cook v. Heckler*, 783 F.2d 1168, 1172 (1986) (holding that it is the duty of the ALJ to "include in the text of her decision a statement of the reasons for that decision."). In the instant case, the ALJ "agree[d]" with the state agency physicians' opinions that "show[ed] . . . the claimant's

ability to perform exertional work or non-exertional work requirements [which were] not grossly restricted, and to the extend that the opinions seem[ed] consistent with the majority of the objective findings in the medical evidence" (R. 23). Even though the ALJ did not reject the opinions, he failed to designate which opinions by the state agency physicians and psychologist with which he agreed or to include any reason for his agreement therewith or rejection thereof. This analysis falls short of step four in *Hines*, supra, in that the ALJ did not discuss the consistency of the findings of the state agency physicians with the other findings and medical opinions in the record.

Drs. Fanyutti and Pascasio both restricted Plaintiff's exertional limitations to sedentary; the ALJ found Plaintiff was capable of light exertional work. C.F.R. §404.1567 provides:

> Physical exertion requirements. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full range of light work, [one] must have the ability to do substantially all of these activities.

Both Drs. Franyutti and Pascasio found Plaintiff could occasionally lift and/or carry ten pounds, frequently lift and/or carry ten pounds, stand and/or walk for at least two hours in an eight-hour work day, sit for a total of about six hours in an eight-hour work day, and push/pull unlimited. There was no other physician or medical provider who opined Plaintiff could work at the light level. Dr. Garner did not offer an opinion as to Plaintiff's ability to work; Dr. Seegar did not find exertional limitations in the light range; Dr. Jones did not make a finding as to Plaintiff's exertional capabilities; Dr. Epstein did not express an opinion as to Plaintiff's exertional limitations. Nonetheless, the ALJ made a finding that he agreed with the opinions of the state agency physician

which were consistent with the majority of the evidence. Based on this analysis, the undersigned cannot identify on what "majority" evidence the ALJ relied.

Additionally, Dr. Marinelli found Plaintiff's MRFC was "reduced by moderate limitations in memory, concentration, persistence, social functioning & judgement [sic]." Dr. Marinelli found Plaintiff had "the capacity for routine competitive employment involving short & simple instructions with low interpersonal & pressure demands" (R. 300). The ALJ agreed with this opinion to the extent that it was consistent with the majority of the evidence of record; however, the ALJ did not indicate to which evidence the opinion, or parts of the opinion, was consistent. The undersigned notes Dr. Marinelli's opinion was supported by Dr. Stein's opinion. He found Plaintiff to be "moderately depressed," "moderately deficient in the social functioning arena," moderately deficient in her ability to concentrate, mildly deficient in her persistence, and moderately slow in her pace (R.285). Since the ALJ did not analyze these limitations in his decision or include or specifically reject any limitations as expressed by either of these psychologists in his RFC, it is unclear on what evidence the ALJ relied in formulating his RFC; therefore, the ALJ's decision as to the opinion evidence is not supported by substantial evidence.

### D. RFC

Plaintiff contends the ALJ erred because the RFC finding is not supported by the evidence of record.

S.S.R. 96-8p defines a residual functional capacity as follows:

RFC is what an individual can still do despite his or her limitations. RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities. . . . RFC is assessed by adjudicators at each level of the administrative review process based on all of the

41

relevant evidence in the case record, including information about the individual's symptoms and any "medical source statements" -- i.e., opinions about what the individual can still do despite his or her impairment(s)-- submitted by an individual's treating source or other acceptable medical sources.

The ALJ's RFC was as follows:

> Based on all available evidence, the undersigned finds that the claimant retains the residual functional capacity to perform the exertional demands of light work, or work which requires maximum lifting of twenty pounds and frequent lifting ten pounds; some light jobs are performed while standing, and those performed in the seated position often require the worker to operate hand or leg controls. (20 C.F.R. §§ 404.1567 and 416.967). In addition, the claimant has the following non-exertional limitations: she must be able to briefly (one to two minutes) change positions at least every 30 minutes; she can do no job that requires her to climb ladders, ropes, scaffolds, stairs or ramps; she can do no job requiring more than occasional balancing, stooping, kneeling, crouching, or crawling; she can do no job which requires exposure to extremes of heat, cold, wetness or humidity; she can do no job unless it is in a controlled environment; she can do no job that requires exposure to extremes of fumes, dusts, gases, or other respiratory irritants; she cannot work in areas of significant vibrations; she cannot work around environmental hazards such as dangerous, moving machinery, or unprotected heights; she cannot do any job that requires good hearing acuity; she cannot work in areas of significant background noises while receiving instructions and should be able to receive oral instruction face-to-face; and she must be able to miss up to one day of work per month (R. 22).

The ALJ found Plaintiff could perform the exertional demands of light work; however, as noted above in the undersigned's analysis of opinion evidence, the ALJ did not make it clear how he reached this decision. The ALJ gave less weight to Dr. Seegar's opinions about Plaintiff's exertional limitations, which were less than light; he assigned the same weight to the opinion of Dr. Jones, Plaintiff's orthopedist. Additionally, the ALJ's agreement with the opinions of the state agency physicians, "to the extent that they show that the claimant's ability to perform exertional work or non-exertional work requirements are not grossly restricted, and to the extend that the opinions seem consistent with the majority of the objective findings in the medical evidence . . . with the exception given to the opinions in Exhibits B11F and B19F [Drs. Franyutti's and Pascasio's RFC's], which

indicate that the claimant can perform, essentially, a limited range of sedentary work" (R. 23), is vague, inconclusive, and not based on an analysis of "all of the relevant evidence in the case record, including information about the individual's symptoms and any 'medical source statements,'" as mandated by S.S.R. 96-8p. Based on the ALJ's analysis of the opinions of and evidence provided by those physicians he actually evaluated, the undersigned cannot identify the evidence and/or opinions on which the ALJ relied in formulating his RFC; therefore, the ALJ's RFC is not supported by substantial evidence.

## E. Credibility

Plaintiff asserts the ALJ erred because he improperly considered Plaintiff's credibility and engaged in selective citation when doing so. Defendant asserts that substantial evidence supports the ALJ's finding that Plaintiff's allegations of intense, persistent, and debilitating symptoms were not entirely credible.

In *Craig v. Chater*, 76 F.3d 585, 595 (1996), the Fourth Circuit mandated the following protocol relative to the consideration and analysis of an individual's complaints of pain:

> 1) For pain to be found to be disabling, there must be shown a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but *the pain the claimant alleges she suffers*. The regulation thus requires at the threshold a showing by objective evidence of the existence of a medical impairment "which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Cf. Jenkins*, 906 F.2d at 108 (explaining that 42 U.S.C. § 423(d)(5)(A) requires "objective medical evidence of some condition that could reasonably be expected to produce the pain alleged"). *Foster*, 780 F.2d at 1129 . . . .

> 2) It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, *that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated*, *See* 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1). Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings, *see*

*id.;* any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. *See* 20 C.F.R. § 416.929(c)(3) & 404.1529(c)(3). (Emphasis added).

The ALJ's credibility finding was as follows:

After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible (R. 23).

The ALJ complied with the first step mandated by *Craig*, supra. Next, the ALJ was required to analyze the evidence in accord with step two. The ALJ found the following:

The undersigned finds that the claimant is not entirely credible, particularly with regard to her allegations of pain, limitations, and overall disability. The claimant's pain and limitations in her leg and back have been shown to be related primarily to muscle pains and deconditioning, rather than because of a significant degenerative problem which could not be addressed with increased exercise or physical therapy. The claimant, however, has indicated that her pain had prevented her from exercising and performing physical therapy (see e.g. Exhibit B22F/10), though her objective medical evidence does not substantially support her complaints of pain, particularly when considered in light of her activities of daily living (R. 23).

Plaintiff contends the ALJ misrepresented the findings by Dr. Jones.[1] The ALJ noted that Plaintiff's pain and limitations were due to her deconditioning and not a degenerative condition (R. 23). Dr. Jones' finding was as follows: "I still think mostly she has some back muscle problems because she tends to be a little round back and does [not] get a lot of exercise. I think she needs to work on some back extension exercises, and I think that would help some. She is awfully deconditioned, and I think it may be a problem" (R. 356). The undersigned finds the ALJ did not

_____

[1]Plaintiff notes the ALJ did not "provide any citation" for the reviewer of his decision to identify the source of this opinion. Plaintiff assumes the ALJ was referring to Dr. Jones' June 28, 2007, opinion.

misrepresent the June 28, 2007, findings by Dr. Jones as to Plaintiff's being deconditioned; however Dr. Jones did not make a finding that Plaintiff's pain and limitations were not caused by a degenerative condition. In his decision, the ALJ considered Plaintiff's February 20, 2006, lumbar spine x-ray, which showed "'mild anterior wedging' with little depression of the superior end plate from her prior compression fraction, along with narrowing of the hip joints due to degenerative changes" (R.19). In June, 2007, Dr. Jones reviewed Plaintiff's x-rays and opined he "did not see any changes from when we x-rayed her back in February" (R. 357). Those x-rays showed, as the ALJ noted, degenerative disease. Dr. Jones referred Plaintiff to Dr. Epstein for a consultative examination (R. 357). Dr. Epstein's impressions were for "mechanical low back pain secondary to left hip bursitis and left knee pain with gait deviations"; lumbar sprain; developmental spondylolisthesis at L5-S1, grade 1, from spondylolysis at L5; mild degenerative disk disease in the thoracic spine; thoracic sprain; and "left greater trochanteric bursitis" (R. 354). Both Dr. Jones and Dr. Epstein acknowledged Plaintiff had degenerative diseases, but neither doctor opined that Plaintiff's pain was *not* caused by those degenerative changes.

Next, Plaintiff contends the ALJ misrepresented the finding of Dr. Seegar. The ALJ noted that Plaintiff informed Dr. Seegar on May 25, 2006, that her pain "prevented her from exercising and performing physical therapy" (R. 23). The office notes of Dr. Seegar show that Plaintiff told him that she as "having trouble exercising secondary to pain in her left thigh and knee. . . . She does have physical therapy order set up for Petersburg. She has not gone yet, and I have encouraged her to take advantage of this and go for physical therapy as I think this could be very beneficial for her" (R. 340). The undersigned finds the ALJ's finding as to the May, 2006, opinion of Dr. Seegar is not

supported by substantial evidence. Plaintiff reported difficulty when she exercised, due to pain; she did not report to Dr. Seegar any impact that her pain had on her participating in physical therapy.

In addition to the above, the ALJ failed to consider Plaintiff's complaints of limitations as they are caused, or not caused, as the case may be, by her mental limitations. As will next be noted in this report and recommendation, the ALJ did not find Plaintiff's mental limitations to be medically determinable impairments even though there is objective medical evidence that Plaintiff had mental limitations, as provided by Dr. Marinelli and Dr. Stein. The undersigned concludes, hereafter, that this finding is not supported by substantial evidence. The undersigned could, for this reason alone, find substantial evidence does not support the ALJ's determination that Plaintiff was not credible. The undersigned finds, however, for all of the reasons above stated, substantial evidence does not support the ALJ's finding that Plaintiff was not entirely credible.

### F. Mental Impairments

Plaintiff contends the ALJ erred because he failed to address Plaintiff's "severe" mental impairments and resulting work-related limitations.

In his decision, the ALJ noted the following:

On May 18, 2006, the claimant underwent a State Agency consultative psychological examination and she was diagnosed with pain disorder, major depression and osteogenesis imperfecta (Exhibits B15F/3). Her concentration was moderately deficient, her persistence was mildly deficient, and her pace was moderately slow (Exhibit B15F/4) (R. 20).

State Agency physicians completed PRTFs . . . upon review of the claimant's medical file (Exhibits . . . B17F, B18F . . .). The undersigned has considered these opinions and, to the extent that they show that the claimant's ability to perform . . . non-exertional work requirements are not grossly restricted, and to the extent that the opinions seem consistent with the majority of the objective findings in the medical evidence, the undersigned agrees with them . . . (R. 23).

The "majority of the objective findings in the medical evidence" relative to Plaintiff's mental impairments are as follows:

- In May, 2006, Dr. Stein listed Plaintiff's objective symptoms as "moderately depressed . . . [and] poor memory and poor concentration" (R. 284);

- In May, 2006, Dr. Stein found Plaintiff to be of "low average intelligence" (R. 284);

- In May, 2006, Dr. Stein diagnosed Axis I as "pain disorder associated with general medical condition. Major depression, recurrent type, nonpsychotic";

- In May, 2006, Dr. Stein found Plaintiff to be "moderately deficient in the social functioning arena"; to have moderately deficient concentration; to have mildly deficient persistence; and to have moderately slow pace (R.285);

- In June, 2006, Dr. Marinelli opined that Plaintiff's MRFC was "reduced by moderate limitations in memory, concentration, persistence, social functioning & judgement [sic]"(R. 300);

- In June, 2006, Dr. Marinelli found Plaintiff could follow "short & simple instructions with low interpersonal & pressure demands" (R. 300).

To be severe, an impairment must significantly limit the claimant's physical or mental ability to do basic work activities. 20 C.F.R. §404.1520(c), 416.920(c). The ALJ did not find Plaintiff' mental impairments to be severe. His finding as to Plaintiff's impairments were based on Dr. Marinelli's report and the ALJ "agreed" with those findings to the "extent that they show that the claimant's ability to perform . . . non-exertional work requirements are not grossly restricted, and to the extent that the opinions seem consistent with the majority of the objective findings in the medical evidence" (R. 24). Dr. Marinelli's findings were based on his review of Dr. Stein's findings and were the only two opinions in the record as to Plaintiff's mental impairments.

S.S.R. 96-4p provides:

An "impairment" must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques. . . . Once the existence of a medically determinable physical

47

or mental impairment(s) that could reasonably be expected to produce the pain or other symptoms alleged has been established on the basis of medical signs and laboratory findings, allegations about the intensity and persistence of the symptoms must be considered with the objective medical abnormalities, and all other evidence in the case record, in evaluating the functionally limiting effects of the impairment(s).

Objective medical evidence existed that Plaintiff had some limitations in her mental functioning; the ALJ, however, did not thoroughly address those findings. Even if Plaintiff's mental functional limitations are not severe, they are arguably a medically-determinable impairment. 42 U.S.C. §423(d)(2)(B) and 42 U.S.C. §1382(c)(a)(3)(F) provide:

In determining whether an individual's physical or mental impairment or impairments are sufficient medical severity that such impairment or impairments could be the basis of eligibility under this section, the Commissioner of Social Security shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity. If the Commissioner of Social Security does find a medically severe combination of impairments, the combined impact of the impairments shall be considered throughout the disability determination process.

The ALJ failed to analyze or consider the findings by Drs. Stein and Marinelli that Plaintiff had been diagnosed with moderate major depression and being moderately deficient in the social functioning arena, moderately deficient in concentration, mildly deficient in her persistence, and moderately in her pace. The ALJ's decision is not supported by substantial evidence.

### G. New and Material Evidence to Appeals Council

Plaintiff argues that the new and material evidence submitted to the Appeals Council indicated Plaintiff suffered side effects from her prescription medication that would seriously erode her residual functional capacity.

The new and material evidence that was submitted to Appeals Council was an April 2, 2008, letter, written by Dr. Sheap and addressed "To Whom It May Concern." Dr. Sheap wrote he had treated Plaintiff for atopic dermatitis, which he treated with Hydroxyzine. Dr. Sheap wrote the

medication could "cause significant to the point that its use may interfere with driving and with the operating of powered machinery." Dr. Sheap wrote that he had "warned [Plaintiff] of this potential" side effect to the medication and instructed her to not drive or operate machinery after taking the medication (R. 375).

Defendant asserted that "there is no evidence, not even from Dr. Sheap, that [Plaintiff] would be sleeping during working hours. Moreover, even assuming that sleeping were a valid work limitation, the ALJ did provide jobs requiring the operating of powered machinery at step five" (Defendant's brief at p. 16).

Because the undersigned finds this matter should be remanded to the Commissioner for other reasons, as noted above, the merits of these arguments will not be addressed. Upon remand, the ALJ shall review and address the evidence submitted by Dr. Sheap as to the side effects, if any, that Hydroxyzine may have on Plaintiff.

## V. RECOMMENDED DECISION

For the reasons above stated, I find that the Commissioner's decision denying the Plaintiff's application for Supplemental Security Income is not supported by substantial evidence, and I accordingly recommend that the Defendant's Motion for Summary Judgment be **DENIED** and the Plaintiff's Motion for Summary Judgment be **GRANTED** and this action be **REMANDED** to the Commissioner for further action in accordance with this Report and Recommendation/Opinion

Any party may, within ten (10) days after being served with a copy of this Recommendation for Disposition, file with the Clerk of the Court written objections identifying the portions of the Proposed Findings of Fact and Recommendation for Disposition to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable

Frederick P. Stamp, Jr., United States District Judge. Failure to timely file objections to the Proposed Findings of Fact and Recommendation for Disposition set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such proposed findings and recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record

Respectfully submitted this __6__ day of _November_, 2009.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE